**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**

FILED
2008 Jun 06 PM 01:51
CLERK U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
TOLEDO



Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 07-34195 |
| | ) | |
| George E. Coup, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| | ) | JUDGE MARY ANN WHIPPLE |

### MEMORANDUM OF DECISION AND ORDER REGARDING MOTION TO DISMISS

This case is before the court on the United States Trustee's ("the UST") motion to dismiss Debtor's Chapter 7 case for abuse under 11 U.S.C. § 707(b)(1) and (3) [Doc. # 15], Debtor's response [Doc. #25] and the UST's reply [Doc. # 26]. The court held a hearing on the motion that Debtor, his attorney, and counsel for the UST attended in person and at which the parties had the opportunity to present testimony and other evidence in support of their respective positions. The court has jurisdiction over this case under 28 U.S.C. §1334 and the general order of reference entered in this district. Proceedings to determine a motion to dismiss a case under § 707(b) are core proceedings that the court may hear and decide. 28 U.S.C. § 157(b)(1) and (b)(2)(A). Having considered the briefs and arguments of counsel and having reviewed the record in this case, for the reasons that follow, the court will grant the UST's motion and dismiss Debtor's Chapter 7 case unless he converts it to Chapter 13.

### BACKGROUND

Debtor George Coup ("Coup") is sixty years old, married and has no dependent children. He testified, however, that he has a thirty-one-year-old daughter who works as a waitress and who would soon

be moving in with him and his wife. According to Coup, he and his wife also care for their four young grandchildren on Wednesdays and every other weekend. Coup is employed as a maintenance manager at Hanson Aggregate, where he has been employed for forty-one years. Coup testified that his job is stable and that he earned $71,584 in 2005, $75,474 in 2006 and approximately $78,000 in 2007. He testified that he has no plans for retirement. His wife, Marlene Coup, who is not a debtor is this case, is also employed by a nursery and landscaping company where she has worked for eight years on a seasonal basis, approximately nine months out of every year. George and Marlene Coup maintain separate bank accounts and separately pay for certain household and individual expenses.

On September 26, 2007, Coup filed for relief under Chapter 7 of the Bankruptcy Code, stating that his debts are primarily consumer debts. His Schedule D shows secured debt in the amount of $178,000, which represents debt secured by a first and second mortgage on his home. Coup testified that both he and his wife own their home, which he values at $184,000, but that only he is liable on the loans secured by their real property. He has reaffirmed both his first and second mortgage debt. Coup's bankruptcy schedules also show unsecured nonpriority debt in the amount of $168,900, consisting entirely of credit card obligations, and no unsecured priority debt .

Coup's Schedule I shows monthly income after payroll deductions for him in the amount of $4,304 and for his wife in the amount of $1,856, for a total of $6,160.[1] However, Marlene Coup testified that, in light of the fact that she works only nine months out of the year, her take home pay averages $1,600 per month over a twelve month period.[2] Therefore, on average, George and Marlene Coup have a combined monthly income of $5,904.

Coup filed an amended Schedule J separately setting forth expenses paid by him and by his non-filing wife. Coup's separately listed expenses, not including business expenses reimbursed by his employer, total $4,142. His expenses include the following family living expenses, that is, household expenses paid by Coup that directly benefit both him and his wife: mortgage expenses of approximately $1,282, property tax expense of $184, electricity and heating fuel expenses of $350, water and sewer expense of $36, telephone expense of $45, cable expense of $45, trash collection expense of $22, home maintenance expense of $100, and food expense of $500, for total family monthly living expenses of $2,564. The separately listed

---

[1] Coup's Schedule I also lists an additional $2,092 as business income. However, he testified that this figure represents reimbursements received by him of business expenses that he lists in the same amount on Schedule J.

[2] Marlene Coup also testified that she receives unemployment benefits of $446 every two weeks during the three months that she is not working. It not clear whether this amount is part of or in addition to the $1,600 monthly average.

2

personal and family living expenses paid by Marlene Coup total $2,599. With respect to the family living expenses, there appears to be some duplication of expenses already listed under expenses paid by her husband since expenses paid by Marlene Coup include a cable expense of $48 and telephone expenses (other than her cell phone) of $46. Other family living expenses set forth as being paid by Marlene Coup include a home maintenance expense of $150 and a food expense of $300. In addition to family living expenses, Schedule J reflects, among other things, Marlene Coup's budget of $400 for savings, which she testified applies to the nine months during which she is working in order to supplement her unemployment benefits when she is not working, and $145 for gifts. Neither Coup nor his wife contribute to a 401(k) plan and both drive older model cars for which they have no car payment. They do, however, incur significant repair costs for those vehicles.

Coup testified that he incurred the $168,900 credit card debt over a period of four to five years. In 2005, he refinanced the first mortgage on his home and granted a second mortgage in order to pay a total of $69,000 on his credit card debt. In April or May 2007, Coup consulted with a credit counseling agency but was told that they were unable to provide any assistance. Although he used his credit cards on several occasions thereafter, he continued to pay at least the minimum payments on each of his credit card accounts until the date of filing his petition. In order to make these payments, Coup not only used the checks he received for reimbursement of his business expenses but also depleted his savings. After consulting with his bankruptcy attorney, he stopped using all of his credit cards. Coup testified that since he filed his bankruptcy petition and stopped paying on his credit card debt, he now has a monthly surplus of between $500 and $1,000.

Coup's Form B22A calculating the means test shows that the annualized current monthly income for him and his non-filing wife at the time of filing his case was $95,844, more than twice the median income for a family of two in Ohio. However, no presumption of abuse arose under § 707(b)(2) after the calculation of allowed deductions. Instead, the UST filed a timely motion to dismiss for abuse under § 707(b)(3) based on the totality of the circumstances.

## LAW AND ANALYSIS

This case must be decided under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23, ("BAPCPA" or "the Act") because it was filed on September 26, 2007, after the effective date of the Act. Where debts are primarily consumer debts, the court may, after notice and a hearing, dismiss a Chapter 7 petition "if it finds that the granting of relief would be an abuse of the provisions of [Chapter 7]." 11 U.S.C. § 707(b)(1). Before BAPCPA, courts considered whether to

3

dismiss a case for "substantial abuse" under § 707(b) based on the "totality of the circumstances." *See, e.g., In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989); *In re Price*, 353 F.3d 1135, 1139 (9th Cir. 2004). The Sixth Circuit explained that "substantial abuse" could be predicated upon either a lack of honesty or want of need, to be determined by the totality of the circumstances. *Krohn*, 886 F.2d at 126. Congress incorporated its own version of this judicially created construct in § 707(b)(3) by requiring a court to specifically consider "(A) whether the debtor filed the petition in bad faith; or (B) the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3)(A) and (B). Although pre-BAPCPA case law applying these concepts is still helpful in determining abuse under § 707(b)(3), under BAPCPA Congress has lowered the standard for dismissal in changing the test from "substantial abuse" to "abuse." *In re Mestemaker*, 359 B.R. 849, 856 (Bankr. N.D. Ohio 2007).[3]

The UST invokes the totality of the circumstances analysis under § 707(b)(3)(B) in arguing that granting Coup a discharge in this case would be an abuse of the provisions of Chapter 7. Pointing to Coup's above median income, his wife's budget for gifts and savings, and Coup's testimony regarding his monthly surplus of funds after his expenses are paid, the UST asserts that Coup is not needy and has the ability to repay a meaningful portion of his unsecured debt in a Chapter 13 case. In addition, he argues that Coup has treated his creditors unfairly by using the checks received by him for reimbursement of business expenses to make payments on credit card accounts other than those on which the business expenses were charged and by using the credit cards on several occasions after consulting a credit counseling agency. As the movant, the UST carries the overall burden of demonstrating, by at least a preponderance of the evidence, that Debtor's case should be dismissed. *In re Gonzalez*, 378 B.R. 168, 172 (Bankr. N.D. Ohio 2007).

Under § 707(b)(3)(B), the court must determine whether the debtor is "needy," that is, whether "his financial predicament warrants the discharge of his debts" in a Chapter 7 case. *Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 434 (6th Cir. 2004). Factors relevant to this determination include the ability to repay debts out of future earnings, which alone is sufficient to warrant dismissal under some circumstances.

---

[3] As this court noted in an earlier opinion:
While Congress has clearly lowered the dismissal standard, articulation of what that change really means in decision-making in a particular case is a slippery enterprise at best. A totality of circumstances amounting to substantial abuse would obviously also amount to abuse. The converse is not necessarily true. Perhaps more telling legislative evidence of a Congressional intent that bankruptcy courts should now afford less deference to a debtor's choice of Chapter 7 relief is the elimination from amended § 707(b) of the language in former § 707(b) stating that "[t]here shall be a presumption in favor of granting the relief requested by the debtor."
*In re Carney*, No. 07-31690, 2007 WL 4287855, *2, 2007 Bankr. LEXIS 4100, *7 (Bankr. N.D. Ohio December 5, 2007).

4

*Krohn*, 886 F.2d at 126. Other factors include "whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities." *Id.* at 126-27. "Courts generally evaluate as a component of a debtor's ability to pay whether there would be sufficient income in excess of reasonably necessary expenses to fund a Chapter 13 plan." *Mestemaker*, 359 F.3d at 856 (citing *In re Behlke*, 358 F.3d 429, 435 (6th Cir. 2004)).

In this case, Coup enjoys a stable source of income, having worked for his employer for over forty-one years. At this time, he has no plans to retire. Notwithstanding the seasonal nature of her job, Marlene Coup also enjoys a relatively stable source of income. As a debtor with regular, stable income, Coup is eligible for adjustment of his debts through Chapter 13 since his debts are less than the statutory eligibility limits. *See* 11 U.S.C. §§ 109(e), 101(30). While his Schedule I and amended Schedule J reflect a negative monthly cash flow, Coup testified that, since stopping payments on his credit card debt, he now has a surplus of between $500 and $1,000 per month. Given the "surplus" nature of these funds, they could be applied to repay a meaningful portion of Coup's unsecured debt without depriving him or his wife of any necessity.

Furthermore, although there are differing opinions as to the degree of its relevance, courts have generally concluded that a non-filing spouse's income is also relevant to the determination of a debtor spouse's ability to pay. *See*, *e.g., In re Baldino*, 369 B.R. 858, 860-62 (Bankr. M.D. Pa. 2007) (relying on the definition of "current monthly income" and holding that a non-filing spouse's income should be considered in a § 707(b)(3) analysis only in the amount that is regularly contributed to household expenses); *In re Travis*, 353 B.R. 520, 531 (Bankr. E.D. Mich. 2006) (finding that a non-filing spouse's income should be considered only if the income "is substantial enough to significantly raise the debtor's standard of living and generate total household income in excess of the reasonable costs of food, clothing, shelter and other necessities"); *In re Welch*, 347 B.R. 247, (Bankr. W.D. Mich. 2006) (considers non-filing spouse's income in connection with whether the debtor spouse should be subsidizing the "incremental living costs" of the non-filing spouse and any dependent of the non-filing spouse); *see In re Reese*, 236 B.R. 371, 375 (Bankr. N.D. Ohio 1999) (considering non-filing spouse's income only to extent of the debtors' daily living expenses that benefit the non-filing spouse by virtue of the fact that the two share a joint household); *In re Falke*, 284 B.R. 133, 224-25 (Bankr. D.N.D. 1991) (same); *In re Smith*, 157 B.R. 348, 351 (Bankr. N.D.

5

Ohio 1993) (considering both the debtor's and the non-filing spouse's income and expenses).

Rather than focusing on the non-debtor spouse's arguably objectionable individual expenses as urged by the UST, this court finds persuasive the approach set forth in *Reese* and *Falke*. In *Reese,* the court explained:

> "In calculating whether there is discretionary income available to fund a plan one must, of necessity, observe to what degree a debtor's daily living expenses are shared as co-obligations of the non-debtor spouse or are assumed completely by that spouse.... To be clear, the non-debtor spouse's income is not being rendered liable for the debts of the Debtor but rather is simply being considered in determining whether the Debtor himself has available discretionary income by virtue of the fact that he and the non-debtor spouse share a joint household."

*Reese*, 236 B.R. at 375 (quoting *In re Berndt*, 127 B.R. 222, 225 (Bankr. D.N.D. 1991)). Similarly, in *Falke*, the court noted that "'Congress expressed no intention that 707(b) should effect [sic] a non-debtor or that any non-debtor should be required to tighten his or her belt in order to assist the debtor in paying debts.'" *Falke*, 284 B.R. at 138 (quoting *In re Attanasio*, 218 B.r. 180, 235 (Bankr. N.D. Ala. 1998)). Nevertheless, the court concluded that when determining whether there is discretionary income available to a debtor,

> "a court should assume that each party to a relationship, to the extent of his or her income, shares equally in paying the family living expenses and the court should attribute at least one-half of the family living expenses to the debtor and the other half to the non-debtor spouse. The appropriate measure of the debtor's ability to pay for purposes of 707(b) would then be the debtor's sole income minus a one-half share of the family living expenses. . . ."

*Id.* at 138 (quoting *Attanasio*, 218 B.R. at 234-35)).

In this case, Coup and his wife live together as a family unit. The court, therefore, finds it appropriate to apply Marlene Coup's income to at least a portion of the family living expenses that include the mortgage, property taxes, utilities, telephone, cable, trash and home maintenance and total $2,064. Although the amended Schedule J setting forth Marlene Coup's expenses include telephone and cable expenses, these appear to be a duplication of expenses set forth as Coup's expenses. And without some special circumstance indicating the necessity of a $250 per month home maintenance expense, Marlene Coup's budgeted amount of $150 in addition to Coup's $100 for home maintenance is excessive. Her budget includes no other family living expenses, with the exception of a $300 food expense.[4] Marlene

---

[4] Coup and his wife's expenses total $800 per month for food. While this appears excessive for two people, they also care for their four grandchildren approximately eight to ten days every month. As they both contribute a sizeable amount for food, the court does not consider this expense as an expense to which Marlene Coup should contribute additional funds.

6

Coup's income, which averages $1,600 per month, is sufficient given the nature of her other expenses to share in a significant portion of the family living expenses, thus creating discretionary income for Coup. Specifically, the court believes that Marlene Coup is able to contribute at least $400 to $500 per month towards payment of their family living expenses. With this adjustment to Coup's reported Schedule J expenses, his expenses approximate $3,650 to $3,750, leaving him with approximately $550 to $650 as discretionary income, very close to the "surplus" income to which Coup testified. Thus, even without Coup's testimony regarding his "surplus" funds, the court would still find that he could repay a meaningful portion of his unsecured debt. Payment of this discretionary income into a Chapter 13 plan over the course of five years, the applicable commitment period of a Chapter 13 plan for an above median income debtor such as Coup, would total, after administrative expenses, approximately $30,800 to $36,400. As Coup's schedules show unsecured debt in the amount of $168,900, and no unsecured priority debt, unsecured creditors may receive a dividend of between approximately 18% to 21% under a Chapter 13 plan, or more if claims are not filed by all creditors as frequently occurs. *See In re Behlke*, 338 F.3d at 437 (finding substantial abuse where debtors had the ability to pay at least a 14% dividend to their unsecured creditors).

An additional factor argued by the UST as demonstrating abuse under § 707(b)(3)(B) is his assertion that Coup treated his creditors unfairly by applying checks received by him for reimbursement of business expenses to pay for charges on accounts other than those on which the business expenses were charged. The court questions whether this is an appropriate factor in considering the totality of the circumstances of Coup's financial situation under § 707(b)(3)(B). Nevertheless, Coup did not act dishonestly in applying the reimbursement check in the manner he did in order to make the minimum payments due on additional credit cards. There is no evidence that any particular creditor extended Coup credit based on the fact that the charges would be reimbursed by his employer. And no creditor has objected to the dischargeability of its debt in this case.

The UST also argues that abuse is demonstrated by the fact that Coup used his credit cards on several occasions after consulting a credit counseling agency. Although not articulated by the UST, the court assumes his argument is that Coup used the credit cards in contemplation of bankruptcy, knowing that he could not pay for the charges made. While the court finds this argument more appropriately made under § 707(b)(3)(A), there is, nevertheless, no evidence that Coup contemplated filing bankruptcy at the time the charges were made, and he continued making monthly payments on each credit card account until the date he filed his petition. After consulting with his bankruptcy attorney, he ceased use of all of his credit cards.

Finally, the court notes that Coup did attempt to seek relief through private negotiations through the

7

assistance of a credit counseling agency and that his efforts were unsuccessful.  Also, there is no evidence regarding the availability of debtors' remedies under state law and, as the UST bears the burden of proof on the motion, the court will assume that there are none available.  While these two factors weigh in favor of Coup, on balance, the court finds that granting him relief under Chapter 7 of the Bankruptcy Code would be an abuse of the provisions of that chapter given the following financial circumstances: Coup has regular, stable income, is eligible for relief under Chapter 13, and is able to pay a meaningful portion of his unsecured debt out of his future income without depriving himself or his wife of adequate housing, food, clothing, or other necessities.

**THEREFORE**, for the foregoing reasons, good cause appearing,

**IT IS ORDERED** that Coup is allowed thirty (30) days from the date of this order to file a motion to convert to a Chapter 13 case, absent which the United States Trustee's motion to dismiss [Doc. #15] will be granted, and this case will be dismissed, by separate order of the court.

8

07-34195-maw    Doc 36    FILED 06/06/08    ENTERED 06/06/08 13:51:27    Page 8 of 8